IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

**IN THE MATTER OF THE SEARCH OF:**

**11957 Ridgeway Park Drive, Charlotte, NC; a 2022 Hyundai Tucson vehicle; and a DJI Unmanned Aircraft System**

Case No.: **3:26 mj 58**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Joseph D. Fialka, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of a residence, motor vehicle, and an unmanned aircraft system (UAS), as described in Attachments A-1 and A-2, to seize the items or information described in Attachments B-1 and B-2.

2. I am a Senior Federal Air Marshal (FAM) with the Federal Air Marshal Service (FAMS) and have been since May 2002. Prior to the FAMS, I was a police officer and detective in Durham, North Carolina. Upon joining the FAMS, I was assigned to the Charlotte Field Office where I was assigned to in-flight security, airport liaison, Visible Intermodal Prevention and Response (VIPR) as the Radiological, Nuclear, Biological, and Chemical (RNBC) coordinator and technician, and Training Department as an Instructor and Medic.

3. Currently, I am assigned to the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF) and have been since June 2024. I am an Airport Liaison Agent and Assistant Counter Unmanned Aircraft Systems (CUAS) Coordinator. As such, I hold responsibility to investigate violations of federal law involving the aviation domain and participate in Special Event coverage as a plain-clothed investigator for large events that

1

could be terrorism targets. Some of these events have Temporary Flight Restrictions instituted by the Federal Aviation Administration (FAA) and frequently attract operators of unmanned aircraft systems , which are also commonly referred to as "drones." As such, some of my investigative responsibilities have included investigation of criminal and national security violations to determine whether unmanned aircraft system operators have violated Federal law. I am a "Federal law enforcement officer" as defined by Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

5. In this affidavit, "SUBJECT PREMISES" refers to a condominium residence located within the Western District of North Carolina at 11957 Ridgeway Park Drive, Charlotte, North Carolina, and a dark gray-colored 2022 Hyundai Tucson assigned North Carolina registration plate HKD4875 and bearing VIN number 5NMJF3AE9NH004604, as further detailed in Attachment A-1.

6. In this affidavit, "SUBJECT DEVICE" refers to an unmanned aircraft system (UAS), as further detailed in Attachment A-2, but including a DJI Mavic Air 2 bearing serial number 3N33J91002W075. The UAS is a complete system and includes: the aircraft, controller for the aircraft, cameras, accessories and electronic storage mediums that can be attached to, or inserted into, the aircraft or controller.

7. I respectfully submit that, based upon the information provided in this affidavit, there is probable cause to believe that on the SUBJECT PREMISES there is the SUBJECT DEVICE and that the SUBJECT DEVICE is itself evidence of the commission of criminal offenses and was used in the  commission of criminal offenses, and on the SUBJECT DEVICE there is currently concealed evidence of the commission of criminal offenses.  The relevant criminal offenses are violations of Title 49, United States Code, Sections 46306(b)(5) and (b)(6) and Title 18, United States Code, Section 39B(b)(1).  I therefore respectfully request that the Court issue the attached search warrant authorizing

2

the search of the SUBJECT PREMISES and SUBJECT DEVICE, as more fully described in Attachments A-1, A-2, B-1, and B-2.

## BACKGROUND, DEFINITIONS, AND APPLICABLE LAW

8. The FAA is an agency within the United States Department of Transportation responsible for maintaining the safety and efficiency of the navigable airspace within the United States. The FAA created the National Airspace System (NAS) to protect persons and property on the ground, and to establish a safe and efficient airspace environment for civil, commercial, and military aviation. In the FAA Modernization and Reform Act of 2012, the FAA was charged with safely integrating unmanned aircraft systems, commonly referred to as "drones," into the NAS.

9. Title 49, United States Code, Sections 40102 or 44801, define the following terms used in this affidavit:

   a. "Aircraft" means any contrivance invented, used, or designed to navigate, or fly in, the air.

   b. "Unmanned aircraft" means an aircraft that is operated without the possibility of direct human intervention from within or on the aircraft.

   c. "Small unmanned aircraft" means an unmanned aircraft weighing less than 55 pounds, including the weight of anything attached to or carried by the aircraft.

   d. "Unmanned aircraft system" (UAS) means an unmanned aircraft and associated elements (including communication links and the components that control the unmanned aircraft) that are required for the operator to operate safely and efficiently in the national airspace system.

10. Title 49, United States Code, Section 46306(b)(5), among other things, prohibits the owner of an aircraft eligible for registration under Section 44102 from knowingly and willfully operating, or attempting to operate, the aircraft when the aircraft is not registered under Section 44103.

3

11. Title 49, United States Code, Section 46306(b)(6), among other things, prohibits the knowing and willful operation, or attempt to operate, an aircraft eligible for registration under Section 44102, when the operator knows that the aircraft is not registered under Section 44103.

12. Title 14, Code of Federal Regulations (CFR), Part 48 (14 CFR 48) provides requirements for registration and marking requirements for small unmanned aircraft. Specifically, 14 CFR 48.15 states that "No person may operate a small unmanned aircraft that is eligible for registration under 49 U.S.C. 44101-44103 unless one of the following criteria has been satisfied: (a) The owner has registered and marked the aircraft in accordance with this part; (b) The aircraft is operated exclusively in compliance with 49 U.S.C. 44809 and weighs 0.55 pounds or less on takeoff, including everything that is on board or otherwise attached to the aircraft; or (c) The aircraft is an aircraft of the Armed Forces of the United States."

13. Further, 14 CFR 48.25, provides that, "[t]o register a small unmanned aircraft in the United States under this part, a person must provide the information required by § 48.110 to the Registry in a form and manner prescribed by the Administrator. Upon submission of this information, the FAA issues a Certificate of Aircraft Registration to that person. A small unmanned aircraft must be registered by its owner using the legal name of its owner, unless the owner is less than 13 years of age. If the owner is less than 13 years of age, then the small unmanned aircraft must be registered by a person who is at least 13 years of age."

14. Title 18, United States Code, Section 39B(b)(1), prohibits the knowing operation of an unmanned aircraft within a runway exclusion zone.

15. "Runway Exclusion Zone" (REZ) as the term is used in Title 18, United States Code, Section 39B(b), is defined by Section 39B(b)(2) as follows: "a rectangular area-- (A) centered on the centerline of any active runway of an airport immediately around which the airspace is designated as class B, class C, or class D airspace at the surface under part

4

71 of title 14. Code of Federal Regulations; and (B) the length of which extends parallel to the runway's centerline to points that are one (1) statute mile from each end of the runway and the width of which is one-half (1/2) statute mile."

**PROBABLE CAUSE**

16. On March 10, 2026, at approximately 12:37 PM, a detection was received via the Dedrone Aeroscope G8-TSA_CLT_Airport UAS detector, which is located at the Charlotte Douglas International Airport (CLT), 5501 Josh Birmingham Parkway, Charlotte, North Carolina 28208. The information provided by the detection device was that there was a UAS launch that occurred within the Runway Exclusion Zone and property boundaries of CLT, specifically positioned at the Airport Overlook, located at 5130 Airport Overlook Drive, Charlotte, North Carolina 28208.

17. The airspace immediately around CLT is designated as class B airspace at the surface under part 71 of title 14, Federal Code of Regulations.

18. The Airport Overlook is on the property of CLT and sits between two active runways (36/18 Center and 36 Left/18 Right), which were in use -- with aircraft arriving and departing -- during the times of the detected UAS flight. The Airport Overlook is entirely within a Runway Exclusion Zone. The Airport Overlook is shown on the following map, between the runways:

5



19. A UAS violated the FAA-established REZ at the Charlotte Douglas International Airport on March 10, 2026, between 12:37 PM local time and 12:49 PM local time.

20. The UAS sensor data first detected this UAS at around 12:37 p.m. and detected that it flew between 30 feet above ground level and approximately one hundred 100 feet above ground level for 7.64 minutes.

21. I understand from my training, experience, consultation with other experienced officers, and knowledge of this investigation, that a UAS flying at such heights raises significant public safety concerns and could potentially disrupt air traffic control for manned aircraft and other aircraft.

22. At around 12:37 p.m., FAMs received UAS sensor data from one set of UAS sensors that detected the UAS and the approximate altitude during its flight. Based on my training, experience, consultation with other experienced officers, and knowledge of this investigation, I understand that law enforcement agents commonly use this type of UAS

6

sensor data to detect, track, and monitor UASs flying in restricted airspace. Law enforcement agents do this so they can locate and approach the UAS operator, address public safety concerns, and advance investigations of illegal conduct. I understand that agents investigating UAS violations have used and found this type of UAS sensor data reliable in their enforcement operations and case investigations. For example, the sensor data almost always leads agents to within yards of the operator of the UAS that it detects.

23. In response to the alert cited above, FAMs C.H. and J.F. responded to the CLT Airport Overlook, located at 5130 Airport Overlook Drive, Charlotte, NC 28208, and observed Marco Ochoa (OCHOA) standing at the rear of a vehicle -- more fully identified as a dark gray-colored Hyundai Tucson assigned North Carolina registration plate HKD4875 and bearing VIN number 5NMJF3AE9NH004604 -- with the trunk open, and holding a camera tripod. C.H. approached OCHOA and observed, in plain view sitting in the open trunk, a black pelican case with a "DJI" sticker on it. C.H. identified himself as a federal law enforcement agent. OCHOA admitted that he had just operated "his" drone at the Airport Overlook.

24. OCHOA stated he was creating social media content for a client and was using his DJI Mavic Air 2, serial number 3N33J91002W075 -- the SUBJECT DEVICE -- to create the video footage. Upon inspection of the UAS, C.H. found that the SUBJECT DEVICE did not possess any FAA identifiable registration. The serial number on the SUBJECT DEVICE corresponded with the Dedrone Aeroscope G8-TSA_CLT_Airport UAS detector alert that initially caused FAMS to respond to the area where they found OCHOA. A FAM took the following photograph while interacting with OCHOA:

7



25. On the SUBJECT DEVICE, specifically the controller component, OCHOA showed video footage to C.H. and J.F. It was video that OCHOA captured using the SUBJECT DEVICE during flight. The video showed an approximately 7-minutes-long flight with the SUBJECT DEVICE flying between 32- and 100- feet above ground level.

26. Signage posted at the entrance and inside of the CLT Overlook states that drone use is prohibited. An example is shown in the photograph on the next page:



27. I have researched the SUBJECT DEVICE and its manufacturer advertises that the make and model of the SUBJECT DEVICE weighs approximately 1.25 pounds.

28. OCHOA is 50 years old.

29. I have conducted a records check with the FAA in connection to this matter and have confirmed that OCHOA did not have authorization to fly a UAS within the established REZ on March 10, 2026, and had not registered the SUBJECT DEVICE as required.

30. After his interaction with the FAMS, OCHOA left the CLT Airport Overlook with the SUBJECT DEVICE.

31. Based on Your Affiant's research, a UAS of the same make and model as the SUBJECT DEVICE has an approximate retail value of $599.00-1,000.00.

32. Based on physical surveillance and research of law enforcement databases, Your Affiant believes OCHOA resides at 11957 Ridgeway Park Drive, Charlotte, NC.  Further, when the FAMS encountered OCHOA, the SUBJECT DEVICE was sitting in the trunk of a dark gray-colored Hyundai Tucson assigned North Carolina registration plate HKD4875 and bearing VIN number 5NMJF3AE9NH004604, which is registered to OCHOA.  On April 7, 2026, in the morning, the aforementioned Hyundai Tucson was parked in the parking lot at 11957 Ridgeway Park Drive, Charlotte, NC.

## ADDITIONAL TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:
    a.  SIM Card: Subscriber Identity Module (SIM) or Subscriber Identification Module (SIM) is an integrated circuit (IC) intended to securely store the international mobile subscriber identity (IMSI) number and its related key, which are used to

10

identify and authenticate subscribers on mobile telephony devices (such as mobile phones and laptops, and in this case UASs). A SIM card is a smart card that stores identification information that pinpoints the UAS/Drone to a specific mobile network.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, or video files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

34. Based on my training, experience, and research, which includes consulting DJI Technology LLC, and DJI manufacturer's advertisements and product technical

11

specifications available online at https://www.dji.com, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a digital camera and captures GPS navigation data while in flight. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed the device and where and how the device was utilized.

35. Based on knowledge, training and experience, I know that the SUBJECT DEVICE contains electronic and/or computer components that may contain stored names, video and/or media data, geographic location information (longitude, latitude, altitude, etc.) and/or other electronic data about the flights conducted, the owner and operators of the flights, and potential warnings or other messages – concerning flight in restricted areas – transmitted to the operator during flights. Based on my training and experience, this information could be saved to parts of the UAS, including attached storage/data memory cards or flash drives. Based on my knowledge, training and experience, I know that these types of electronic devices can store information for long periods of time. This information can oftentimes be recovered with forensic tools.

36. *Forensic evidence.* As further described in Attachment B-2, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

38. I also understand that to successfully complete a forensic extraction from a UAS it may be necessary to repair the device, replace the chassis, reconnect wires, or replace a battery. I also understand that it may be necessary to employ advanced forensic processes to bypass data access restrictions. In some extreme cases, the device(s) may be damaged beyond repair, password protected, locked or otherwise inoperable and traditional data analysis techniques will not work. In these cases, it may be necessary to use an analysis technique referred to as "chip off". "Chip off" is a process where the Ball Grid Array or memory chip (BGA) is removed from the device(s) using heat or an infrared light. The chip itself is then analyzed. This is a destructive process and will render the device(s)

13

unusable, but it may allow for the complete collection of all data stored on the memory chip.

## CONCLUSION

39. I submit that this affidavit establishes probable cause for a search warrant authorizing the search of the SUBJECT PREMISES for the SUBJECT DEVICE, and the seizure of the SUBJECT DEVICE, as described in Attachments A-1 and B-1, and (2) the search of the SUBJECT DEVICE and seizure of information associated with the SUBJECT DEVICE, as described in Attachments A-2 and B-2.

Respectfully submitted,

Joseph D. Fialka
Senior Federal Air Marshal
FBI Task Force Officer

*This Affidavit was reviewed by AUSA David Kelly.*

**Sworn to before me and signed in my presence on this ___9th___ day of April, 2026, at 2:30 PM.**

**Hon. David C. Keesler**
**United States Magistrate Judge**
**Western District of North Carolina**

14

## ATTACHMENT A-1

**To be searched:** A condominium residence located at 11957 Ridgeway Park Drive, Charlotte, North Carolina, and a motor vehicle, specifically a dark gray-colored Hyundai Tucson assigned North Carolina registration plate HKD4875 and bearing VIN number 5NMJF3AE9NH004604; all collectively referred to as the "SUBJECT PREMISES."

## ATTACHMENT A-2

**To be searched:** A DJI Mavic Air 2 unmanned aircraft system (UAS), serial number 3N33J91002W075; the UAS is a complete system and includes: the aircraft, controller for the aircraft, cameras, accessories and electronic storage mediums that can be attached to, or inserted into, the aircraft or controller -- all collectively referred to as the "SUBJECT DEVICE."

This warrant authorizes the seizure and forensic examination of the SUBJECT DEVICE for the purpose of seizing the evidence and information described in Attachment B-2.

Below are photographs depicting some parts of the SUBJECT DEVICE (photographs taken by Federal Air Marshals on March 10, 2026).

 

## ATTACHMENT B-1

**To be seized:** A DJI Mavic Air 2 unmanned aircraft system (UAS), serial number 3N33J91002W075; the UAS is a complete system and includes: the aircraft, controllers for the aircraft, cameras, accessories and electronic storage mediums that can be attached to, or inserted into, the aircraft or controller -- all collectively referred to as the "SUBJECT DEVICE."

<strong><u>ATTACHMENT B-2</u></strong>

**To be seized:**

1. All records on the SUBJECT DEVICE, which is described in Attachment A-2, that relate to violations of Title 18, United States Code, Section 39B and Title 49, United States Code, Section 46306, including:

a. All electronic data, logs, documents, records and/or other items, located in the SUBJECT DEVICE that contain evidence of the involvement of anyone in operating, controlling and directing the operation of the SUBJECT DEVICE;

b. All electronic data, logs, documents, records and/or other items, located in the SUBJECT DEVICE that contain evidence of anyone operating, controlling, and directing the operation of the SUBJECT DEVICE in an Runway Exclusion Zone;

c. Evidence of instructions, regulations, manuals, warnings, or other guidance regarding the federal regulations and statutes governing the lawful use of drones and other UASs in public space, including evidence of any warnings provided to the operator of the SUBJECT DEVICE about flight or operation restrictions;

d. Any records of geographical location data, including Global Positioning Satellite (GPS) entries, Internet Protocol Connections, and Location entries, to include Cell Tower and Wi-Fi entries;

e. Indicia of ownership, use, access, control, and possession of the SUBJECT DEVICE;

f. Any information, including lists, schedules or itineraries, related to any individuals identifying uses of the SUBJECT DEVICE for other possible flights for the purpose of revenue from March 09, 2026 thru March 11, 2026; and

g. Data related to electronic applications installed and/or used on the SUBJECT DEVICE.

2. Evidence of user attribution showing who used or owned the SUBJECT DEVICE the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.